### COUCH et al. v. SOUTHERN METHODIST UNIVERSITY et al. (No. 9921.)*

(Court of Civil Appeals of Texas. Dallas. Dec. 18, 1926. Rehearing Denied Jan. 15, 1927.)

1. Covenants ⬤≈69(1)—Restrictive covenants held to run with the land independent of declaration in deeds to that effect.

Restrictive covenants, which were created both for benefit of purchaser of land conveyed by grantor and for benefit of land retained by it, and were intended to be annexed to the land, *held* to constitute covenants running with the land independent of declaration in deeds to that effect.

2. Injunction ⬤≈62(3)—Grantor can appeal to court of equity to enforce compliance with restrictive covenants, where improvement scheme created thereby was yet to be realized.

Where substantial benefits to flow to grantor, and which, in part, moved it to inaugurate improvement scheme by placing restrictions in deed limiting use of property for residential purposes, were yet to be realized, grantor can appeal to court of equity to enforce compliance with covenants, unless grantees can, under power of amendment given them in deeds, use property for business purposes, as they attempted to do.

3. Covenants ⬤≈79(3)—Right of grantees to enforce restrictive covenants does not follow, because grantor has such right, where deeds did not provide that restrictions were intended for mutual benefit of purchasers.

Where restrictive covenants appearing in deeds executed by grantor did not expressly provide that they were intended for mutual benefit of each purchaser of lots in the addition, right of grantees to enforce covenants against purchasers intending to violate restrictions does not follow, because grantor has such right.

4. Covenants ⬤≈79(3)—Where land is held by grantees from common grantor subject to improvement restriction, negative equitable easement arises.

Where common grantor, opening tract of land, inaugurates general scheme of restrictive improvement to which entire tract is subject, negative equitable easement arises in which the various purchasers of lots have interest and between whom there exists mutuality of covenant and consideration.

5. Vendor and purchaser ⬤≈230(5)—Purchasers of property subject to restrictions held chargeable with notice of creation and existence of negative equitable easement and grantee's right thereunder.

Where purchasers' deeds recited that they purchased lots subject to restrictions contained in supplemental agreement between grantor and its immediate grantee, which agreement provided that building restrictions were not only for mutual benefit of parties to agreement, but for purchasers of lots whose deeds contained such restrictions, purchasers *held* chargeable not only with notice of creation and existence of negative equitable easement, but also of grantee's rights thereunder.

6. Covenants ⬤≈51(2)—Clause in deed, authorizing amendment of restrictive covenant, held not to authorize changing of exclusive residential district to a mixed resident and business district; "amend."

Clause in deed, authorizing an "amendment" of conditions in restrictive covenant in deed, *held* not to authorize changing of addition from an exclusive residential district to a mixed resident and business district; "amend" meaning to improve or reform and not to abrogate or destroy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Amend—Amendment.]

---

⬤≈For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted February 16, 1927.

**7. Injunction ⟨⟩136(2)—In suit to enjoin violation of building restrictions, granting of temporary writ of injunction held not abuse of discretion.**

In suit to enjoin erection of business building in restricted residential districts, granting of temporary writ of injunction *held* not abuse of discretion.

Appeal from District Court, Dallas County; T. A. Work, Judge.

Suits by the Southern Methodist University and by E. D. Jennings and others to enjoin A. B. Couch and others from erecting business houses on restricted residential property. Suits consolidated. Temporary writ of injunction ordered issued, and defendants appeal. Affirmed.

Thomas, Frank, Milam & Touchstone, of Dallas, for appellants.

Cockrell, McBride, O'Donnell & Hamilton, of Dallas, for appellees.

JONES, C. J. Southern Methodist University, duly incorporated as an educational institution, filed suit in a district court in Dallas county for the purpose of enjoining appellants A. B. Couch and F. E. Welfare and wife from the erection of business houses on property owned by them located in University Park addition, and, on presentation of a duly verified petition, a temporary restraining order was issued. Appellees E. D. Jennings, Mrs. L. Sneed, a widow, S. L. Barron, A. D. Schweissler, C. A. Nichols, and R. E. Dickinson, residents of University Park addition and owners of lots therein, also filed suit against appellants as defendants, seeking the same relief as in the other suit, and, on presentation of their verified petition, a similar restraining order was issued. In each of these suits appellants were notified to show cause at a named date why such restraining order should not continue as a temporary writ of injunction.

Appellants answered each suit by motion to dissolve the restraining order and by answer to the merits. These two suits were consolidated and the motion to dissolve, as well as the application for the granting of a temporary writ of injunction, was heard, with the result that the motion to dissolve was overruled and a temporary writ of injunction was issued. Appellants have duly perfected their appeal from such orders.

For convenience, appellee the Southern Methodist University will be styled "University" and the other appellees herein "appellees." The suits are based on the following facts:

The University conducts the character of educational institution suggested by its name, and has erected and uses suitable buildings for such purpose, on a campus of 133 acres. The western boundary of this campus is Hillcrest avenue, a street running north and south. Included in the land it owned adjacent to its campus was a tract of approximately 73 acres. The eastern boundary of this tract is Hillcrest avenue.

In 1913, the University concluded to have this tract of land platted into blocks and lots and conveniently laid out in streets and alleys for the purpose of placing it on the market as an addition to the city of Dallas, and entered into a contract with Dallas Trust & Savings Bank to act as its trustee in carrying out this purpose, and later, in 1914, executed a deed of conveyance to its said trustee, placing the legal title of the tract of land in said trustee for such purpose. The contract entered into in 1913 was not placed of record, but it contained a provision that—

"As soon as practicable after the execution of this contract, the parties will prepare and agree upon a schedule of prices and restrictions for and under which the lots are to be sold. * * *"

The deed executed on July 1, 1914, for the purpose of carrying out this contract, recited that it was executed for such purpose, gave to the grantee as trustee full power of sale, and further provided that any purchaser of a lot from said trustee "shall not be bound to inquire into the terms of said contract nor in anywise to see to the application of the purchase money." The property was duly platted in blocks and lots and streets and alleys duly laid out, and on March 27, 1915, the dedication deed, including a map of the blocks, lots, and streets, was placed of record, and the addition designated as "University Park addition to the city of Dallas."

The streets in the said addition running north and south are in their order from the east side of said addition: Hillcrest avenue, Dickens, Thackeray, and Golf drive. Those extending east and west and terminating in Hillcrest avenue, beginning from the south side, are: Roberts, University boulevard, and Hainey avenue. Adjacent to the lots in this addition is what is styled "Installment No. 2 of University Park," which was platted by the University as a business district. Restrictive covenants were agreed upon by the parties and the property was extensively advertised as a restricted resident district. All of the lots sold by the trustee contained the hereinafter described restrictions.

On September 9, 1920, the trustee re-deeded the unsold lots in said addition to the University. On the same date, the University deeded to N. H. Martin a large number of lots in said addition, still retaining ownership in a number of lots unsold. This deed to Martin did not contain the restrictive covenants that had been placed in all other deeds by the said trustee. The omission of the restrictive covenants in said deed was an oversight, and

when this omission was discovered, and while Martin was the owner of all the lots he had purchased, an agreement was entered into between the parties in said conveyance, making the restrictive covenants applicable to such lots. This agreement was placed of record June 13, 1922. This instrument recited the fact that, prior to Martin's purchase of these lots, the above-named trustee had sold other lots in said addition to various other persons, subject to certain building restrictions, and that the failure to place the same building restrictions in Martin's deed was an oversight, and also recited that—

"It is to the mutual benefit of all parties hereto, as well as other owners of property situated in the above-numbered blocks, that proper building restrictions should be imposed upon the lots so sold to N. H. Martin."

The parties then declared that the restrictions therein named—

"shall apply to the lots so sold and conveyed by Southern Methodist University to N. H. Martin."

These restrictions are in effect the same that had been placed in all the deeds theretofore executed to lots in this addition. The restrictions are contained in 11 paragraphs and it is not considered necessary to give them in detail. Paragraph 2 declares that each lot shall be used for private residence purposes only and by white persons only. Paragraph 3 declares that no boarding fraternity, sorority, or apartment house will be allowed on any lot. The other paragraphs prescribe the minimum frontage of a lot, the character and cost of buildings that may be erected on a lot, this varying to some extent on certain streets, the position of the house to be erected, its distance from the street, the position and character of garages and servants' houses, the limitation of fences, as well as other things designed to beautify and ornament each lot on which a residence is erected. There is also a prohibition against the building of any house on the rear of any lot or facing on an alley for any purpose except servant' house, stables, garages, etc., and for the use of the occupants of the main residence and their bona fide servants.

It was recited in the Martin agreement that—

"The above conditions and each of them shall be covenants running with the land and bind the same in the hands of subsequent vendees, however remote, and should any of said conditions be violated at any time within 21 years, the title to said land shall revert to the Southern Methodist University, its successors or assigns, as the case may be."

There is also contained in the said agreement the following provision:

"Provided, however, that at any time any of the above conditions so far as they affect the property on Hillcrest avenue between Roberts avenue and University boulevard; University boulevard between Hillcrest avenue and Dickens street; University boulevard between Dickens and Thackeray street; University boulevard between Thackeray street and Golf drive; Haynie avenue between Hillcrest avenue and Dickens street; and Haynie avenue between Dickens street and Thackeray street, may be amended by a vote of three-fourths of the owners of said streets voting according to front foot holdings, each front foot counting as one vote."

In every other deed these restrictions are made covenants running with the land for a period of 21 years from the date of the deed. There was one deed, however, in which these covenants were omitted, and there appears no explanation as to why this was done. It does appear, however, that the owner of the lots conveyed by this deed has substantially complied with all the said conditions; there being one or two departures in minor detail from these conditions.

Appellant Couch purchased his property on Hillcrest avenue from N. H. Martin, February 20, 1923, subject to the conditions and restrictions now of record covering said addition. The other appellants own the other property on Hillcrest avenue involved in this appeal by mesne conveyances from N. H. Martin; the deeds reciting that it was purchased subject to the conditions and restrictions now of record covering said addition.

There is a business district on the block of Hillcrest avenue immediately south of this addition. Hillcrest avenue and University boulevard are the two main thoroughfares used in entering the University campus from the city of Dallas and the traffic on these streets is very heavy.

The University bases its suit for injunction on the grounds that it is the common source of title to all property in said addition, and that, previous to the placing of the addition on the market, it had inaugurated a general scheme or plan for creating University Park addition a restricted residence district; that this general scheme or plan was inaugurated for the benefit of itself as owner of the property and also for the benefit of each purchaser of a lot; that, if the business houses were permitted to be erected by appellants on their lots, it would violate this scheme or plan, change the purpose thereof, and result in damage to the property still owned by it.

The other appellees base their suit for injunction on the grounds that they had been induced to purchase their property because of their knowledge that this addition was a restricted residence addition, had paid an increased price for their lots by reason of such fact, and that they would suffer damages to their property if appellants were permitted to erect the said business houses. The allegations, both of the University and of the other appellees in respect to their

right to maintain the suit, are full and complete.

Appellants defend the suits on the grounds that the property they own, by reason of its proximity to the said other business district, by reason of its proximity to the University campus, and by reason of the heavy traffic on Hillcrest avenue, had ceased to be desirable residence property, and on the further ground that the agreement between Martin, their predecessor in title, and the University, the owners of property on Hillcrest avenue between Roberts street and University boulevard, could amend any condition contained in the restrictive covenants by a favorable vote of three-fourths of the property owners on Hillcrest avenue between said two streets, and that, prior to their attempt to erect said business houses on their property, the condition restricting the property to private residences had been amended three separate times, each one supplemental of the other, and which amendments each removed the restriction forbidding the erection of business houses on their property, and that, therefore, under the very terms of the restrictive covenant, they had the right to erect said buildings.

The amendments above referred to, among others, contained the stipulation that no tract shall be sold as a business site which does not have a frontage of at least 25 feet on the street on which the lot faces, and that—

"Said lot may be used for private residence purposes or for business houses, sorority houses, fraternity houses, apartments, offices, garages, or any other purpose not constituting a nuisance; but, if said lot shall be used for private residences, it shall be used by white persons only."

This then is followed by restrictions as to the erection of residences similar to those in the original covenants.

[1, 2] The restrictive covenants, subject to which each of the appellants purchased, by apt words are made covenants that run with the land. Independent of this declaration, the facts and circumstances show unmistakably that they were created both for the benefit of purchasers of land conveyed by the University and of the land retained by it, and were intended to be annexed to the land, thereby fulfilling the requirements necessary to create such covenants. The evidence conclusively shows that substantial benefits to flow to the University, and which, in part, moved it to inaugurate the said improvement scheme, are yet to be realized. It necessarily follows that the University can appeal to a court of equity to enforce compliance with these covenants, unless appellants, under the power of amendment given in them, had the right to amend their conditions in the manner and respect they have attempted to do. This question will be later discussed.

[3, 4] As the restrictive covenants appearing in the deeds executed by the trustee or the University do not expressly provide that they are intended for the mutual benefit of each purchaser of lots in this addition, the right of appellees to enforce them against appellants does not necessarily follow because the University has such right, but rests, in part, upon a different rule of law. It may be stated generally that, where a common grantor opens up a tract of land to be sold in lots and blocks, and, before any lots are sold, inaugurates a general scheme of improvement for such entire tract intended to enhance the value of each lot, and each lot, subseqeuntly sold by such grantor, is made subject to such scheme of improvement, there is created and annexed to the entire tract what is termed a negative equitable easement, in which the several purchasers of lots have an interest, and between whom there exists mutuality of covenant and consideration. 18 C. J. 394, and authorities cited in note.

[5] In the instant case, it appears unmistakably that the University, the common grantor, before any lots in this addition were placed on the market, inaugurated a general scheme or plan of improvement for the purpose of creating an attractive resident district, and manifested this purpose by certain restrictive covenants placed in each deed executed to a purchaser of a lot, or by supplemental agreement, as in the case of Martin, made to apply to lots purchased. A negative equitable easement for the benefit of each purchaser was thereby created and impressed upon the entire tract, and these appellees, purchasers of lots impressed and burdened with such easement, can enforce these restrictions in a court of equity against appellants, purchasers of lots likewise impressed and burdened with such easement, provided appellants had actual or constructive notice of appellees' rights under such easement. Appellants' deeds recite, in substance, that they purchased the lots in question subject to the restrictions contained in the supplemental agreement between Martin and the University, and this agreement, the terms of which they must take notice, recites that these building restrictions are not only for the mutual benefit of the parties to the agreement, but also for the mutual benefit of the purchasers of lots whose deeds contained these restrictions. Appellants are therefore not only charged with notice of the creation and existence of the negative equitable easement, but also of appellees' rights thereunder. It therefore follows that, unless the attempted amendment to these restrictive covenants is binding on appellees, they have the right to appeal to a court of equity to enforce a compliance with such restrictions. Curlee v. Walker, 112 Tex. 40, 244 S. W. 497; Hooper v. Lottman (Tex. Civ. App.) 171 S. W. 270; citations in note to

Stevenson v. Spivey, 21 A. L. R., beginning at page 1281 and extending to page 1288; notes in 33 A. L. R. 676.

The general plan of improvement, as above stated, gave the right to amend any of the conditions in the restrictive covenants, so far as they affected the lots on the street on which they fronted, provided three-fourths of the owners of the property on that street vote in favor of such amendment; each front foot counting as one vote.

The owners of the property in question secured more than a three-fourths vote of the property owners fronting on Hillcrest avenue between Roberts street and University boulevard to amend the conditions, so as to permit the erection of business houses, for any character of lawful business, on any part of said property; in other words, under the guise of an amendment, the dominant purpose of the restrictive covenants is abrogated as to all those lots in block 1 of this addition fronting on Hillcrest avenue, and there is substituted, in lieu thereof, another scheme or plan of improvement wholly inconsistent with the one under which this property was placed on the market and sold. If this was the intention of the clause in the restrictive covenants giving the right of amendment, then no purchaser of lots can complain, because this right of abrogation was a part of the covenants, evidencing the creation of the negative equitable easement attached to all the land in this addition. Is this clause subject to such construction?

[6] The phrase "to amend" is not synonymous with the phrase "to abrogate or destroy." Its synonyms are: "To improve"; "to reform." In ordinary usage, the meaning of amendment as given by the lexicographers is:

"The act of freeing from faults; the act of making better, or of changing for the better; correction; improvement; reformation." Century Dictionary.

An examination of the restrictive covenants containing the conditions under which each lot must be improved shows that they were designed to beautify and to render more attractive this addition for resident purposes. They are all inconsistent with any use of the property other than for the home of a family. They clearly manifest the fact that it was the intention of the University to make these lots very desirable for homes and thereby render them high-priced resident lots. These covenants manifest an outstanding purpose to keep from within the borders of this addition any condition that might render these lots less desirable for a home, so restrictions as to use and conditions as to the manner of improvement are annexed to each lot, that would readily appeal to the æsthetic sense of a seeker of a desirable location for a home. It is a recognized fact that styles of architecture and modes of beautifying the home place undergo changes the same as in other matters. Therefore owners are given the right to perfect or improve, by amendment, those conditions attached to their lots, whose purpose was to make them more attractive for a home, when in their judgment such amendment is desirable.

We therefore hold that the clause in question, authorizing an amendment of the conditions in the restrictive covenant, did not authorize the changing of University Park addition from an exclusive resident district to a mixed resident and business district. We are not unmindful of the fact that the term "amendment," when used by legislative and other deliberative bodies, has a special meaning which permits its use for the purpose of destroying a proposed bill or a proposed resolution. This, however, is not the commonly accepted and understood meaning of such term, and we cannot assume that the parties had such meaning in mind when they used the term in said clause. Continental Casualty Co. v. George M. Easley et al., 290 S. W. 251.

[7] The effect of the issuance of the temporary writs of injunction is merely to maintain the status quo of the subject-matter of the litigation pending the trial of the case on its merits. There are questions of fact raised in reference to the property in this block on Hillcrest avenue, being now wholly unsuited for resident purposes, and of the further fact that the use of it for business purposes would in no way damage appellees in their right in the negative equitable easement, that we do not find necessary to discuss, for the reason that, in any event, we do not believe there was any abuse of the discretion allowed the trial court in the matter of granting temporary writs of injunction.

It is our opinion that this case should be affirmed.

Affirmed.