ABERNATHY v. ADOUE et al.

No. 2099.

Court of Civil Appeals of Texas. Beaumont.
April 14, 1932.

Albert R. Young, of Houston, for appellant.

Lewis Fisher, of Houston, for appellees.

WALKER, J.

Westmoreland addition to the city of Houston, Harris county, was platted and its streets and alleys dedicated by South End Land Company, a corporation, as shown by map, plat, and dedication dated the 1st day of July, 1903, and filed for record in the deed records of Harris county. Within a short while South End Land Company sold out to various and sundry purchasers all the lots in this addition. One of the streets in this addition was designated on the plat and map as Bur-lington avenue. On the 28th day of November, 1904, the South End Land Company sold lots 1 and 2 in block 10, fronting on Burlington avenue, in this addition, to Mrs. George C. Waties. In this deed the use of these lots was restricted as follows: (a) The building line was fixed at 20 feet from and parallel with the west boundary line of Burlington avenue, (b) the lots could be used for residential purposes only; and (c) as long as South End Land Company owned one-half the frontage abutting upon Burlington avenue it reserved the right to enter upon and repair this avenue. It was stipulated in Mrs. Waties' deed that these conditions should be deemed "covenants running with the land," and any person owning land fronting on Burlington avenue was given the right "to prosecute appropriate proceedings in law or in equity" to prevent the violation of the restrictions. All the deeds to property fronting on Burlington avenue contained similar restrictions, as did the deeds to the other property in the addition. On the 9th day of May, 1928, for a consideration of $25,000, H. A. Meyer, holding under Mrs. Waties, deeded these two lots to the city of Houston. The consideration paid was the reasonable cash market value of the lots burdened with the restrictions originating in Mrs. Waties' deed. The city bought these lots for the purpose of extending Milam street across them into West Alabama street, which was done. The result was that the area of these lots was greatly reduced and they were left in the form of a triangle fronting 110 feet on Burlington avenue, 32 feet on West Alabama street, and 134 feet on Milam street. After the lots were reduced in area there was situated thereon a small but substantial dwelling house. The city sold these fractional lots to A. L. Bettencourt for about $8,000 and he sold them to appellant on a recited consideration of $9,000. The amount received by the city and the amount paid by appellant represented the reasonable cash market value of these fractional lots, burdened as they were with the restrictions originating in the deed to Mrs. Waties. The deeds from the city to Bettencourt and from him to appellant did not contain the restrictions originating in Mrs. Waties' deed, but both Bettencourt and appellant bought with knowledge of these restrictions, and that these, or similar restrictions, were in all the other deeds to the property in Westmoreland addition, and of the general plan or scheme under which the lots were originally platted and sold. While these fractional lots were worth only $9,000 burdened with the restrictions in question at the time appellant acquired his title, they were, in fact, worth $25,000 as business property, to be used for filling station purposes. Holding a permit from the city of Houston to build a filling station on these lots, appellant

brought this suit against all the owners of property fronting on Burlington avenue to cancel the restrictions in his title and for grounds of relief made by his petition the issues which will be hereinafter discussed. It is sufficient to say of the answer of defendants that they pleaded general and special demurrer and general denial. Owners of other property in Westmoreland addition not fronting on Burlington avenue intervened on allegations that all the lots in this addition were sold by South End Land Company under a general plan or scheme to make of the addition a highly restricted residential district and that it would injure their property to cancel these restrictions on appellant's lots. Appellant filed exceptions to these pleas of intervention, but if the court ruled thereon the rulings are not shown by judgments, but there appear in the record certain bills of exceptions which purport to reflect the rulings of the court. Upon trial to the court without a jury judgment was entered against appellant upon all issues made by his petition. On his motion the trial court filed conclusions of fact and law. The appeal was duly prosecuted to the Galveston Court of Civil Appeals and transferred to this court by order of the Supreme Court.

**Opinion.**

█ Appellant has not presented his record in such way as to complain of the court's rulings on his exceptions to the pleas of intervention, even if it be conceded that the court ruled thereon. Rulings on exceptions and demurrers cannot be preserved by bills of exception but only by judgments duly entered of record. Ineeda Laundry v. Newton, (Tex. Civ. App.) 33 S.W.(2d) 208.

█ But the filing of these pleas was justified by the allegations of the interveners that the general plan or scheme of South End Land Company in platting and dedicating and selling Westmoreland addition was to create a highly restricted residential district and that the removal of the restrictions from appellant's lots would injure their property. While the interveners were not given a specific right, by the deeds under which they held, to contest appellant's petition, yet, under general principles of equity, they had the right to do so by showing that the cancellation of these restrictions would violate the general plan or scheme under which they purchased their property, resulting in damage to their property. This doctrine is clearly sustained by the authorities. Curlee v. Walker, 112 Tex. 40, 244 S. W. 497; Green v. Gerner (Tex. Com. App.) 289 S. W. 999; Green v. Gerner (Tex. Civ. App.) 27 S.W.(2d) 828 (writ refused); Couch v. Southern Methodist University (Tex. Civ. App.) 290 S. W. 256; Hooper v. Lottman (Tex. Civ. App.) 171 S. W. 270.

██ Appellant was not entitled to any relief against the first restriction because it clearly appeared that, where "west boundary line" of Burlington avenue was referred to in the restrictions, "east boundary line" was meant; nor was he entitled to relief against the third restriction because that was personal to South End Land Company and it was not a party to the suit.

█ That the lots were more valuable—much more valuable—for business purposes than for residential purposes did not entitle appellant to relief against any of the restrictions. The law on this proposition is thus stated by 18 C. J. 400, Note 88: "The mere fact that lots subject to building restrictions have become more valuable for business than for residential purposes as limited by the restrictions, does not of itself, justify equity in annulling the restrictions."

██ It is a sound legal proposition to say, with appellant, "that changed conditions in a neighborhood brought about by agencies outside of the parties themselves will terminate a building restriction limiting or restricting property to use for residential purposes only." But that proposition does not aid appellant. So far as the changed conditions relate to the form and size of his property, that condition was not brought about by a stranger to the title, but immediately and directly by the grantor of appellant and Bettencourt. Besides, there is no merit in the contention that change in the form and size of these lots destroyed their value for residential purposes. On this issue the court found: "That said property is suitable for residence purposes, that plaintiff bought said property with the full knowledge of its conditions and restrictions and since such purchase has made no effort to rent said property for residence purposes, nor has he made any effort to put the building on said premises in such condition as to attract prospective tenants, that the brick bungalow on said land is not connected with sewer, gas, electric lights or water, though all of these conveniences are available to plaintiff." Since this finding is not challenged by appellant, it is not necessary to quote evidence in its support.

█ Again, it is contended that the business area of the city of Houston has so encroached upon this property as to make it unfit for residential purposes. On this issue the court found:

"The City of Houston has grown and its business area has extended in all directions of the compass very considerably during the past ten years and that there are numerous business houses on Milam Street in the City of Houston, none however, than the Humble Filling Station, closer than five blocks to the property owned by plaintiff and described in this petition. That such business encroachments are not of such a nature as to demand the removal of the restrictions on plaintiff's

property; that said property is suitable for residence purposes.

"* * * That at the time the plaintiff purchased the property described in his petition, and prior thereto, a portion of said lots had been cut off by the City of Houston, and that its shape had been altered from what it was as shown on the plat of Westmoreland Addition; that the purchase of said lot by the plaintiff was made subsequent to the time that the City of Houston had opened Milam Street to connect with West Alabama Street, and that plaintiff knew at the time of such purchase of said lot that Milam Street cut off a portion of said property, and that said property was restricted against use for business purposes.

"That at the time plaintiff purchased said property he had knowledge of the fact that the Humble Oil and Refining Company had purchased a lot across the street from the property described in his petition, and that at the time he purchased said property said Humble Oil and Refining Company was erecting a gasoline filling station on the property so purchased by it; that the property upon which Humble Oil and Refining Company was erecting a gasoline station was not in Westmoreland Addition, and that the same was wholly unrestricted.

"That the erection of a building for business purposes on said property would decrease the value of other property in said Addition (of original defendants, as well as intervenors) and would decrease its desirability for residence purposes."

This finding fully supports the trial court's conclusion denying relief under this proposition.

Appellant has seriously challenged the findings just quoted above, but they have abundant support in the evidence. The following testimony of H. A. Meyer, who formerly owned the property involved here, reflects correctly the character of the evidence on this issue:

"That church house and that school house were over there on Milam Street at the time I bought my property in Westmoreland, and that fire station was around there on Berry Street, and the little business house across the street from the fire station, they had all existed there for some time, and existed there for some years after I moved out there. So far as I know those institutions are still in existence. The only change that has taken place out there with reference to the construction of business houses is the erection of a little flower shop on the back end of Mr. Parson's lot, and the erection of the filling station across from the property which I formerly owned. Those are the only changes in that immediate vicinity. There are other changes which have taken place further north. A good many of those stores out on

Louisiana have been there ever since I have lived in Houston. There have been several new stores built on Louisiana since I went out there. I built my home out there in Westmoreland in 1921. * *. *

"There are no business houses on the right hand side of West Alabama as you go on out west. I don't think there is a single business house on the north side of West Alabama. There is a grocery store, a drug store, a sort of community center there on the south side of West Alabama along about the southwest corner of the Westmoreland Addition. That is the A. B. C. Store and the West Alabama Drug Store. Those stores are at the entrance to Audubon Place. Those stores have been there for several years, but they are not in Westmoreland Addition. Coming on east on West Alabama you do not find any more business houses until you get down to the corner of Alabama and Main, and there may be a root beer stand there on that corner, but I am not certain about that. All of that territory from the West Alabama Drug Store to Main Street on West Alabama is occupied by residences. There are not any business houses in Westmoreland Addition other than this little flower shop, but that does not face into the Westmoreland Addition, it faces on Milam Street. * * * The only changed conditions that exist there different from what has existed for a long period of time, in so far as business houses are concerned, is the gasoline station; that is not in Westmoreland, the little flower shop on the back end of Mr. Parson's lot and those business houses built along Francis and Stuart Streets, which are four or five blocks away."

Appellant also contends that the increase in the traffic upon the streets surrounding his property renders it unfit for residential purposes. This contention must be overruled for two reasons. First, the increase in the traffic, if any, was brought about almost entirely by the extension and opening of Milam street into West Alabama street, which was done by appellant's grantor, and of which he cannot now complain. But apart from that, the evidence fails to sustain the issue of serious injury to appellant's property for residential purposes by reason of increase of traffic. Much testimony was offered on this issue, well illustrated by the testimony of the two following witnesses. J. B. Porter, who had been residing on Burlington avenue for some twenty-two or twenty-three years, testified as follows: "Prior to the opening of Milam Street, traffic originating on West Alabama Street, coming towards town, when it reached Burlington Street would turn in Burlington and go down as far as Westmoreland Avenue, and then out the Westmoreland gates on to Louisiana, and into town on that street. The principal amount of the traffic came on to town on Louisiana; some of it would turn over to the right. Since the opening of Mil-

am Street·there has been a decrease of traffic on Burlington Avenue. The house which is on this property at the present time faces on Burlington Street, and there is lots of traffic in front of that house now, even though Milam Street has been opened up. However, there is much less traffic in front of the house since the opening of Milam Street. Since the opening of Milam Street, I don't notice any perceptible increase in the amount of traffic at the junction of those three streets, Burlington, West Alabama, and Milam Streets; of course, possibly there has been a gradual increase in the traffic at that point. That gradual increase in the amount of traffic, however, applies to the whole City of Houston; there has been a gradual increase all over town." H. R. Moore testified as follows: "There is more traffic everywhere than there was a few years ago. I do not think that the opening of Milam Street has increased the traffic on West Alabama to any extent. I think the traffic has been diverted from Burlington to Milam. I have noticed a considerable decrease in the traffic on Burlington, and I have noticed also more traffic north on Milam Street." The testimony of all witnesses showed without any dispute that traffic was increasing all over the city of Houston as a result of its growth during the last ten years.

The authorities fully sustain our conclusion that appellant's property was not so injured by change in form, business conditions, and increase in traffic as to entitle him·to relief. 27 R. C. L. 774, § 539, especially notes 3, 4, 5, and 6 of said section; 18 C. J. 400, § 465, notes 87, 88, 89, 90; 54 A. L. R. 830 to 834, notes; section 539 of 27 R. C. L. 774. Thus in 27 R. C. L. 774, it is said: "The mere fact that the business of a city is spreading towards a restricted residential section, and that the court may be of the opinion that in the near future the property in the restricted area will be chiefly valuable for general business purposes, does not show such a change in the character of the neighborhood as to justify a court in refusing to enjoin a violation of the restriction."

Again, in 18 C. J. 400, it is said: "But where a building restriction is designed to preserve property for residential purposes, its violation cannot be excused on the basis of a changed condition of the surroundings by reason of the fact that it is the opinion of the court that, in a comparatively short time, the premises will be worth more for business than for residential purposes; nor does the mere fact that lots, subject to building restrictions, have become more valuable for business than for residence purposes, as limited by the restrictions, of itself justify equity in annulling the restrictions. A restriction intended to preserve the value of property for residential purposes will not be rendered inoperative by reason of a change in

circumstances, because of the fact that upon a neighboring cross street there has been an increase of business which does not, however, directly affect the character and use of the property in question."

■ Appellant invokes the doctrine of Johnson v. Poteet (Tex. Civ. App.) 279 S. W. 902, to support his proposition of changed condition on the theory that appellees permitted, without objection, the Humble Oil & Refining Company to construct a filling station just across from appellant's property. The proposition is that when the owners in a restricted residential district once permit the violation of the restrictions, they cannot afterwards complain of additional violations. There is no issue of waiver or estoppel in this case, because the Humble Oil Company filling station was built upon unrestricted property not located within the restrictions of Westmoreland addition. .

Under his proposition of waiver and estoppel appellant also insists that appellees have permitted the owner of property near his lots to build thereon a flower shop. This building was erected subsequent to the filing of this suit, and the.evidence showed that the owners of property in the addition had vigorously protested its use and that the promise had been made to remove it.

■ The trial court found that Westmoreland addition was platted under a general plan or scheme to make of it a high-class residential district. .This finding is challenged by appellant, but it finds support in the overwhelming weight of the testimony. Westmoreland addition consists of about 224 lots size 50x125 feet. Since it was originally platted, it has remained a strictly residential section. No business house has ever been built on any lot in the addition, and no attempt was ever made, prior to the filing of this suit by plaintiff, to build or occupy a house in the addition for business or trade purposes, except it was shown on the trial of this case that one man taught violin lessons in his residence, and one woman, for a time, served meals in her residence, and another woman advertised antiques at her residence. As to the general character of this addition, we quote as follows from the testimony of Mr. Porter: "In regard to the character of Westmoreland Addition, its general appearance, shrubbery, trees, and so forth, I can consistently say that I am acquainted in the City of Houston and other cities, and I don't know of an addition which I think is more picturesque or more well kept than Westmoreland. The lawns in Westmoreland are in order; the home owners out there have interest in their places, and they give them close attention. There is foliage, flowers, and shrubbery of all kinds all over the addition. I know of very few houses out there in the addition that are not occupied as

homes; in fact, I know of none, unless it happens to be a vacant house. There are approximately two or three vacant lots in Westmoreland Addition which are not improved. That condition has existed in the addition for the last fifteen or twenty years. The addition is built up permanently with permanent home owners." The plat of the addition shows on its face an attempt to make of it a closed proposition, in that the lots on three sides of the addition all face inward and the streets within the addition all end therein, with the exception of Hawthorn and Ross streets (now West Alabama). The entrance from Louisiana street to Westmoreland avenue, the main thoroughfare within the addition, was marked by the erection of two big posts. At the time the addition was platted there was no development to the south of it, at least to any extent, but the development at that time was confined, for the most part, to the area lying east. It was agreed on the trial that restriction No. 2, dealing with the erection of residences only, was contained in each and every deed executed by the South End Land Company to each and every lot in Westmoreland addition, and that the South End Land Company has parted with title to all the lots in the addition.

The following additional facts show the intent of South End Land Company to make of this addition a residential section: (a) Mr. Kipp, a civil engineer, testified that there were no through streets in the addition, and that this fact indicated to him the purpose to make of it an exclusive residential section; (b) when the property was being sold, the South End Land Company represented to the purchasers that the addition was restricted to residences. Thus W. H. Taylor testified: "By a restricted addition I mean that it was to be used for residence purposes only, and I bought with that idea, that we could always depend on it being a residence addition and could not be converted into business property. That was one of the main talking points of Mr. Condit, who was the sales agent, he had the sale of practically all of Mr. Baldwin's property. * * * At the time I bought this property I guess I knew just as much about the existing restrictions as I do today, because the people who were interested in selling the lots explained it all to me and showed me the abstracts and restrictions. Mr. Condit was the man who explained it to me. Mr. Condit showed me the abstract and the kind of deeds they had drawn to cover these restrictions. I understood that the property had been dedicated and subdivided into an addition, but I did not go to the courthouse and look up the records."

Russell Brown testified: "The thing which induced me to buy a home in Westmoreland was this: the South End Land Company, through Mr. A. J. Condit, stressed the point in opening the addition that it would be solely for residence purposes and never at any time would there be a business house or a business carried on in the addition, due to the fact they had restrictions against such places."

It follows that the pleas of intervention were not only justified by their allegations, but were fully sustained by the proof of the general plan or scheme to make of the addition a restricted residential section and that the removal of these restrictions from appellant's property would injure the property of intervenors, as reflected by the findings of the court quoted above.

The evidence quoted above, under the following authorities, fully sustained the trial court's conclusion that it was the intent of South End Land Company, in platting Westmoreland addition, to make of it an exclusive residential district, and that this general plan and scheme was accepted and acted upon by all the purchasers of property therein. Hooper v. Lottman (Tex. Civ. App.) 171 S. W. 270; Curlee v. Walker, 112 Tex. 40, 244 S. W. 497; Couch v. Southern Methodist University (Tex. Civ. App.) 290 S. W. 256, 259; Plaster v. Stutzman (Tex. Civ. App.) 8 S.W.(2d) 750; Green v. Gerner (Tex. Civ. App.) 27 S.W.(2d) 828 (writ refused); 12 Tex. Jur. 168, §§ 106, 107.

The following authorities discuss and fully support the admissibility of the parol evidence just quoted on the issue of general plan or scheme. Plaster v. Stutzman (Tex. Civ. App.) 8 S.W.(2d) 750; Hubbard v. Ehman (Tex. Civ. App.) 28 S.W.(2d) 270. For other authorities interestingly in point see Rogers v. Hussion (Tex. Civ. App.) 273 S. W. 969; Wilson Co. v. Gordon (Tex. Civ. App.) 224 S. W. 703; 12 Tex. Jur. 168, §§ 106 and 107; 15 Tex. Jur. 779, § 12, 780, § 13, 788, § 19.

Appellees would further limit appellant's general proposition that "changed conditions" would authorize the cancellation of a building restriction limiting the use of property to residence purposes by the following counter proposition:

"Where the changed conditions, invoked as a defense against the granting of an injunction against a threatened violation of a restriction limiting the use of property for residential purposes, and as a ground for removal of same as a cloud, are shown to have affected only the property of him who threatens the violation and seeks the removal, the balance of the restricted district being wholly unaffected thereby, and where it is further shown that the balance of said district will be injured by the violation or removal of the restriction, such changed conditions constitute no defense against granting of an injunction restraining the violation and give rise to no right for removal of the restriction as a cloud.

" * * * It is not our contention that appellant would have to show that business

482

houses, for instance, have been erected inside of Westmoreland but it is our contention that he must show that business houses, for instance, erected outside of Westmoreland, have brought about such a changed condition in Westmoreland as that Westmoreland would not be a less desirable place to live in, were they, from here on out, erected within her border."

This counter proposition has general support in the authorities. 27 R. C. L. 774, says: "On the other hand it is held that if the restriction is still of substantial value to the dominant lot, a court of equity will restrain its violation notwithstanding a general changed condition of the neighborhood. And the fact that most of the premises in the locality are no longer used for residences has been held not to deprive a person who still resides there of the right to enforce a restriction against 'any business injurious or offensive to the neighboring inhabitants.' It has also been held that though there may be cases in which on account of a change in use a restriction may have become of no substantial value to the dominant lot and for such a reason a court of equity will not lend its aid to enforce it and retard improvements, yet, so long as the restriction is of substantial value to the dominant lot, equity will enforce it irrespective of a change in its use and the character of the surrounding locality."

There is no merit in the contention that the failure to insert in the restrictions a time limit made them void as against public policy.

Appellant has other assignments against the admissibility of certain testimony which we do not review because they are clearly without merit.

For the reasons stated the judgment of the lower court is in all things affirmed.