*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DANIEL G. KAMIN HOUGHTON LLC,

Plaintiff/Counter-Defendant-
Appellant,

UNPUBLISHED
October 19, 2023

v

No. 363956
Houghton Circuit Court
LC No. 21-017720-CZ

FLEWELLING PROPERTIES, LLC, and LUCKY
DINING, INC., doing business as KFC OF
FENTON, KFC OF HARTLAND, KFC OF
HOWELL, KFC OF OWOSSO, KFC OF UNION
LAKE, and KFC OF WATERFORD,

Defendants/Counter-Plaintiffs-
Appellees.

Before: CAVANAGH, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's opinion and order granting defendants' motion for summary disposition and denying plaintiff's motion for summary disposition in this case involving reciprocal easements. We vacate in part, affirm in part, and remand for proceedings consistent with this opinion.

## I. BACKGROUND FACTS

In 1993, Shopko Stores Inc. and Ironwood Oil Co. were owners of adjoining parcels of land located in Houghton, Michigan. Shopko operated a discount department store and Ironwood Oil leased its property to a business that operated a gasoline station and grocery store. In 1993, Shopko and Ironwood Oil entered into an agreement titled "Cross-Easement Agreement," which generally granted reciprocal easement rights for pedestrian and vehicular ingress, egress, parking, and for utilities in and through the common areas.

In 2005, Shopko created two commercial outlots on its property near its store. In 2017, plaintiff purchased Ironwood Oil's property, which continued as a grocery store and gas station. In 2019, Shopko ceased operating its department store and sold that property and building. It was

eventually acquired by Evangel Community Church, which operates as a place of worship. In 2021, defendants, Flewelling Properties, LLC, purchased the commercial outlots formerly owned by Shopko, apparently with the intention to lease one of the lots to defendant Lucky Dining, Inc. Lucky Dining intended to construct a Kentucky Fried Chicken (KFC) restaurant. Lucky Dining applied for a building permit in that regard and plaintiff appeared through counsel at the public hearing held by the city planning commission, objecting on the grounds that the proposed restaurant would violate provisions of the Cross-Easement Agreement. The city planning commission, nonetheless, approved the application.

Subsequently, plaintiff filed this breach of contract, trespass, and declaratory judgment action, asserting in its second amended complaint that defendants wrongfully denied the validity of the Cross-Easement Agreement on the ground that Shopko no longer owned the property. Plaintiff asserted that the Cross-Easement Agreement is a binding agreement that runs with the land and defendants' conduct constituted breach of that contract and trespass onto plaintiff's property. Plaintiff further averred, in part, that defendants' proposed development would prevent plaintiff from being able to exercise its rights under the pedestrian easement in Section 2.01.1. Plaintiff would also lose its right to a vehicular easement as provided in Section 2.01.2. Further, defendants would not meet the requirements of parking and of unimpeded access as provided in Sections 2.01.7 and 2.02. And defendants would be violating the requirements of restrictions on development and use as provided in Section 6.01. Accordingly, plaintiff sought a declaratory judgment that the Cross-Easement Agreement was binding on the parties and enforceable, and that defendants' proposed development violated that Agreement; thus, it was prohibited.

Defendants answered plaintiff's second amended complaint and filed a counter-complaint, asserting that plaintiff had previously filed a complaint against the City of Houghton challenging the Planning Commission's approval of the site plan for the proposed KFC restaurant and it was dismissed by the circuit court. Defendants alleged that plaintiff's wrongful conduct intentionally and improperly interfered with defendants' contracts and business relationships and expectancies, amounting to sabotage, and causing disruption, delay, and possible breach and/or termination. Accordingly, defendants sought a judgment in their favor for compensatory damages.

In August 2022, defendants filed a motion for summary disposition of plaintiff's second amended complaint under MCR 2.116(C)(10). Defendants explained that the KFC was to be located on a commercial outlot created in 2005 by Shopko and which had been for sale for 15 years. Plaintiff bought the adjoining property in 2017, fully aware that two commercial outlots were for sale including the one at issue here. In 2019, a church acquired Shopko's property and building that had been used as a department store, but the outlots remained for sale. There had been no shopping center on the parcels since 2019. Defendants asserted that the "circumstances underlying the restrictions contained in the Cross-Easement Agreement recorded in 1993 when the shopping center was built have substantially changed." Defendants claimed that the Cross-Easement Agreement governed the operation of the shopping center at the time, but those two parties no longer owned the respective properties—and those properties were no longer being used as a shopping center as contemplated by the Agreement. Therefore, defendants argued in relevant part, because of the substantial change of circumstances, it would be improper and inequitable to enforce restrictions and negative covenants intended for a shopping center that no longer exists. In support of their argument, defendants relied on the cases of *Dipboye v Acchione*, 351 Mich 550; 88 NW2d 611 (1958) and *Windemere-Grand Improvement & Protective Ass'n v American State*

*Bank of Highland Park*, 205 Mich 539; 172 NW 29 (1919). But in any case, defendants argued, the Cross-Easement Agreement provisions plaintiff referred to either did not apply or were not violated by defendants' proposed use. Therefore, defendants requested the trial court to grant its motion for summary disposition and dismiss plaintiff's second amended complaint. Several exhibits were attached to defendants' motion, including a copy of the Cross-Easement Agreement.

Plaintiff responded to defendants' motion for summary disposition, arguing that the Cross-Easement Agreement is unambiguous and must be enforced as written. And the plain reading of the Agreement defeats the arguments asserted by defendants. "There has been no change in circumstance that warrants any deviation from the contract/cross-easement provision, which specifically prevents Defendants' arguments." Accordingly, plaintiff requested that defendants' motion for summary disposition be denied.

In September 2022, plaintiff filed a motion for partial summary disposition or summary disposition of its declaratory judgment and breach of contract claims under MCR 2.116(C)(10), and for dismissal of defendants' counterclaim under MCR 2.116(C)(8), and affirmative defenses under MCR 2.116(C)(9). Plaintiff explained that it leased its real property to a business that operates a grocery store and gas station. Defendants have proposed the development of a KFC on property located right in front of the Evangel Community Church. But both plaintiff and defendants' properties are subject to the Cross-Easement Agreement recorded in the chain of title. And plaintiff filed this lawsuit requesting the court to declare the Cross-Easement Agreement valid and binding on the parties, and that defendants breached the Agreement and trespassed in violation of the Agreement. Plaintiff argued, in brief, that by the express, unambiguous terms of the Cross-Easement Agreement—including Articles III, XI, and XIV, i.e., Sections 3.01, 3.02, 3.03, 11.01, 11.02, and 14.01—it was a covenant that ran with the land and was binding on every entity having any interest in any portion of the parcels of land at issue; any transfer of land was subject to its provisions and it was perpetual in duration. Plaintiff further argued that, contrary to defendants' affirmative defenses, even if the Agreement had been breached or not previously enforced, the validity of the Agreement remains unaffected and is enforceable, as set forth in Article V, Section 5.03 and Article XIV, Section 15.01. And defendants' proposed development would breach that Agreement, including by preventing or inhibiting plaintiff's vehicular and pedestrian access rights under that Agreement. Accordingly, plaintiff argued that it was entitled to summary disposition, or at least partial summary disposition, of its claims and defendants' counterclaim should also be dismissed for failure to state a claim. Plaintiff attached several exhibits to its motion, including deeds, a copy of defendants' building permit, a copy of the planning commission meeting minutes, a copy of the Cross-Easement Agreement, and maps and photos of the properties.

Defendants responded to plaintiff's motion for summary disposition, arguing that the Cross-Easement Agreement was recorded in 1993 as part of the construction of a "single integrated shopping center" but the only reason for the Agreement—that shopping center—no longer existed. Moreover, defendants' proposed development, which was approved by the planning commission, is consistent with the dictates of the Agreement. For example, vehicular and pedestrian access between the adjoining properties remains available. Defendants' approved plan shows that "pedestrian and vehicular access on the KFC site is reasonable, safe, and does not impede the movement of vehicles or pedestrians to or from either side of the adjacent properties." Accordingly, plaintiff's motion for summary disposition should be denied.

On October 11, 2022, the trial court held oral arguments on the cross-motions for summary disposition and the parties argued consistently with their briefs. In short, defendants argued that the parties who entered into the Cross-Easement Agreement are no longer involved but, more importantly, the Agreement's fundamental purpose of developing and utilizing the former parties' large, adjacent parcels as a single, unified shopping center no longer exists. In fact, in 2019, the original Shopko department store became a church—not a retail store, thereby demonstrating that the original intent of the contracting parties was defunct. Defendants argued that the circumstances had drastically changed and the fundamental purpose of the Agreement no longer existed; therefore, many provisions of the Agreement are invalid and not enforceable, particularly as to the commercial outlot at issue. But in any case, defendants argued, the provisions of that Agreement, particularly as pertains to vehicular access, are not being violated as evident by defendants' site plan for the proposed KFC which shows that vehicles coming to or leaving the KFC never enter the area that used to be a shopping center.

To the contrary, plaintiff argued, the plain, unambiguous language of the Cross-Easement Agreement must be applied as written in its entirety; it runs with the land and successors like defendants are bound by it. And according to the Agreement, "this KFC can't be permitted because the traffic that's the flow back and forth between the parties - - between the - - the parking lots is supposed to be open. They're literally going to build right in the middle of it. So, it violates in [sic] the vehicular, unimpeded access and no curbing." Following arguments, the court took the matter under advisement.

On November 3, 2022, the trial court issued its opinion and order granting defendants' motion for summary disposition and granting plaintiff's motion to summarily dismiss defendants' counter-complaint, thereby dismissing plaintiff's complaint and defendants' counterclaim. With regard to plaintiff's claims, the court stated that the question to be decided was: "Does the 1993 agreement bar construction of a restaurant and supporting structures on Defendant Flewelling's property?" The trial court noted that it must enforce the easement as written if unambiguous, and noted that the language of the easement was not ambiguous. In fact, the court noted, as recognized permissible in *MacLeod v Hamilton*, 254 Mich 653; 236 NW 912 (1931), the agreement's particular purpose was specifically identified. The court stated: "[T]he particular purpose for the granting of reciprocal easements was to utilize the two parcels as an 'integrated shopping center' " which "envisioned the free flow of pedestrian and vehicular travel from one property to the other, thereby providing easy and convenient access for the retail customers of one to avail themselves of the products and services offered by the other." The court noted that the department store and retail establishments operated by the parties to the Cross-Easement Agreement certainly came within the definition of a "shopping center," which was defined as a "group of retail stores and service establishments usually with ample parking facilities . . . ." However, the court held, once "Shopko abandoned its property and it was no longer occupied by a retail or service establishment, the former Shopko property and the former Ironwood Oil property, in combination, no longer could be considered an 'integrated shopping center' as contemplated by the Cross-Easement Agreement. In other words, the express purpose for which the easement grants came into existence ceased to exist." The trial court quoted the *MacLeod* decision, which stated that "[a] grant of an easement for particular purposes having been made, the right thereto terminates as soon as the purposes for which granted cease to exist or are abandoned or are impossible." *MacLeod*, 254 Mich at 656 (quotation marks and citation omitted). Accordingly, the trial court held:

-4-

as soon as the purposes for which the 1993 easement grants ended, the easements terminated. The reciprocal easements, therefore, ceased to exist in 2019 when the former Shopko building was converted to a church and no retail establishments remained on the former Shopko property. As a result, the 1993 Cross-Easement Agreement does not prevent Defendants' proposed construction and operation of a restaurant on the involved outlot as the Cross-Easement Agreement is no longer valid or enforceable.

Thus, defendants' motion for summary disposition under MCR 2.116(C)(10) was granted and plaintiff's motion in that regard was denied. And because the trial court concluded that plaintiff's actions challenging the planning commission's decision and seeking review of its potential easement rights were undertaken for legitimate business reasons, defendants' allegations in their counterclaim were insufficient to state a cause of action and plaintiff's motion for summary disposition of that counterclaim was granted. This appeal followed.

Plaintiff argues that the trial court's interpretation of the purpose of the Cross-Easement Agreement was erroneous, but even if it was for the purpose of supporting an integrated shopping center, the reciprocal easements were valid and enforceable.

## II. ANALYSIS

### A. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). We review de novo a lower court's decision on a motion for summary disposition brought under MCR 2.116(C)(10). *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). A motion brought under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Spiek v Dept of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). The moving party must identify the matters that have no disputed factual issues, and has the initial burden of supporting its position with documentary evidence. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The party opposing the motion must then establish by evidentiary materials that a genuine issue of disputed fact exists. *Id*. at 362-363. After considering the documentary evidence submitted in the light most favorable to the nonmoving party, the court determines whether a genuine issue of material fact exists to warrant a trial. *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004).

"The extent of a party's rights under an easement is a question of fact, and a trial court's determination of those facts is reviewed for clear error." *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005). We review de novo a trial court's dispositional rulings on equitable matters. *Id*., citing *Stachnik v Winkel*, 394 Mich 375, 383; 230 NW2d 529 (1975).

### B. CROSS-EASEMENT AGREEMENT

An express easement is interpreted according to the rules similar to those used for the interpretation of contracts. *Wiggins v City of Burton*, 291 Mich App 532, 551; 805 NW2d 517 (2011). "Where the language of a legal instrument is plain and unambiguous, it is to be enforced as written and no further inquiry is permitted." *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749

(2003). Thus, the purpose of an express easement is ascertained by considering its plain language, according its terms their ordinary meaning. *Id*.; see also *Bayberry Group, Inc v Crystal Beach Condo Ass'n*, 334 Mich App 385, 400; 964 NW2d 846 (2020); *Pugh v Zefi*, 294 Mich App 393, 396; 812 NW2d 789 (2011). A court must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). The use of an easement must be confined to the purposes for which it was granted. *Blackhawk Dev Corp*, 473 Mich at 41 (citation omitted). "Courts of equity do not aid one man to restrict another in the use to which he may put his property unless the right to such aid is clear." *Eveleth v Best*, 322 Mich 637, 642; 34 NW2d 504 (1948) (quotation marks and citation omitted).

The Cross-Easement Agreement at issue here states that Shopko and "the Developer"— defined as Ironwood Oil Company in the first paragraph—were the parties to the contract and that they "desire[d] to develop and utilize the Shopko site and the Developer's Site (hereinafter . . . collectively referred to as the 'Entire Parcel') as an integrated and unified shopping center[.]" The Agreement further provided:

> WHEREAS, the parties hereto desire to provide reciprocal easements for pedestrian and vehicular ingress, egress, parking, passage and traffic and for utilities in, over, upon, across and through the Common Areas and such other areas as are hereinafter provided *as though* the Entire Parcel were developed and utilized as a single integrated shopping center. (Emphasis supplied.)

It is clear from the plain language that the contracting parties' intent was to create reciprocal easements, providing shared access to the "Entire Parcel" so as to allow vehicles and pedestrians to have access into and out of the parking lots on their adjoining properties. More particularly, Article II is titled "Easements" and provides, in relevant part, as follows:

> 2.01. Grant of Easements. Shopko and the Developer hereby each grant to the other and to each individual, partnership, joint venture, corporation, trust, unincorporated association, governmental agency or other business entity now or hereafter holding an ownership interest in fee in any part of the Entire Parcel (which persons are herein sometimes singularly called an 'Owner' and collectively called the 'Owners') the following easements for use by the owners and their respective permittees, without payment of any fee or charge, except as otherwise agreed in writing between the owners:
>
> > 2.01.1. Pedestrian Easements. . . .
> >
> > 2.01.2. Vehicular Easements. . . .
> >
> > * * *
> >
> > 2.01.4. Utility Easements. . . .
> >
> > 2.01.5. Access Easements. . . .
> >
> > 2.01.6. Construction Easements. . . .

2.01.7. <u>Parking Easements</u>. . . .

2.01.8. <u>Lighting Facilities Easement</u>. . . .

2.01.9. <u>Fire and Emergency Access</u>. . . .

2.01.10. <u>Self-Help Easements</u>. . . .

2.01.11. <u>Sign Easements</u>. . . .

2.01.12 <u>Surface Water Drainage</u>. . . .

2.02 <u>Unimpeded Access</u>. . . .

2.03 <u>Prohibition Against Granting Easement</u>. . . .

Article III is titled "Nature of Easements and Rights Granted" and describes, in Section 3.01, that

> [e]ach and all of the easements and rights granted or created herein are appurtenances to the affected portions of the Entire Parcel and none of the easements and rights may be transferred, assigned or encumbered except as an appurtenance to such portions. For the purposes of such easements and rights, the particular areas of the Entire Parcel which are benefitted by such easements shall constitute the dominant estate, and the particular areas of the Entire Parcel which are burdened by such easements and rights shall constitute the servient estate.

Section 3.02 addresses the "Nature and Effect of Easements" and states that the easements, covenants, restrictions, and provisions in the Agreement are for the direct, mutual, and reciprocal benefit of the occupants (which are defined to include the parties, and their heirs, successors and assigns); they create mutual equitable servitudes; constitute covenants running with the land; and "[s]hall bind every person or entity having any fee, leasehold or other interest in any portion of the Entire Parcel at any time or from time to time to the extent that such portion is affected or bound by the easement, covenant, restriction, or provision . . . ." Section 3.03, titled "Transfer of Title," states: "The acceptance of any transfer or conveyance of title from any party hereto or its respective heirs, representatives, successor or assigns of all or any part of its interest in its Site shall be deemed to:

> (a) Require the prospective grantee to agree not to use, occupy or allow any lessee or occupant of such Site to use or occupy the Site in any manner which would constitute a violation or breach of any of the easements and covenants contained herein; and

> (b) Require the prospective grantee to assume and agree to perform each and all of the obligations of the conveying party under this Agreement with respect to any such Site which will be conveyed to each grantee, in each case by a written instrument executed, acknowledged and recorded in the Office of the Register of Deeds of Houghton County, Michigan.

Article IV of the Agreement is titled "Maintenance of Common Areas" and generally states, in Section 4.01, that each owner "shall maintain the Common Areas from time to time located on its Site in a first class manner and in accordance with all applicable laws." Subsequent provisions detail the maintenance, repairs, and care expected and the actions taken for such failures. Article V is titled "Enforcement – Injunctive Relief," and authorizes in Section 5.01, the parties or their respective successors or assigns—in the event of any violations of the terms of the Agreement—the right to collect damages and to enjoin any violations or threatened violation. It further states, in Section 5.03, that a breach of the Agreement does not affect the Agreement, in that it does not cancel, rescind, or otherwise terminate the Agreement.

Article VI of the Agreement is titled "Restrictions on Development and Use," and generally states, in Section 6.01, that "the Entire Parcel shall be developed and utilized consistently with the Site plan attached hereto as Exhibit '3'." Exhibit 3 appears to show three building sites—the proposed Shopko, the proposed food store, and an outlot where a building would be permitted. Section 6.02 provided for "use restrictions" in that, in general, no other "general merchandise discount department store" could be operated as long as Shopko was on site and no other grocery store, convenience store, and/or gas station could be operated as long as Ironwood Oil was on site.

Article XI of the Agreement is titled "Duration and Termination." Section 11.01 states: "The easements, covenants, restrictions and other provisions of this Agreement shall be of perpetual duration." Section 11.02 is titled "Amendment," and states:

> This Agreement, or any easement, covenant, restriction or undertaking contained herein, may be terminated, extended or amended as to each of the portions of the Entire Parcel only by the recording of the appropriate document in the Office of the Register of Deeds of Houghton County, Michigan, which document must be executed by all of the owners and mortgagees, and other holders of recorded interests affected thereby, as of the date of such document, of the Entire Parcel.

Article XIV, titled "Benefit," states in Section 14.01: "The Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, administrators, representatives, successors and assigns." And, Article XV, titled "Waiver," states in Section 15.01: "No waiver of any breach of any of the easements, covenants and/or agreements herein contained shall be construed as, or constitute, a waiver of any other breach or a waiver, acquiescence in or consent to any further or succeeding breach of the same or any other covenant and/or agreement."

Plaintiff here is a successor in interest to the Cross-Easement Agreement between Shopko and Ironwood Oil. Plaintiff purchased Ironwood Oil's property in 2017—while Shopko was still operating its department store—and leases it to another entity which continues to operate a grocery store and gas station just as Ironwood Oil did at that location. And plaintiff purchased the property subject to "covenants, conditions, restrictions of record as of the date" of purchase—which includes the Cross-Easement Agreement at issue here.

In 2021, defendants purchased commercial outlots formerly owned by Shopko, one of which is the subject of this case. Defendants purchased the property subject to "building and use restrictions, reservations, and easements of record." When defendants sought to construct a KFC

restaurant on the property, plaintiff filed this legal action seeking to enforce several terms of the Cross-Easement Agreement, including the easement provisions, as well as the parking and unimpeded access provisions.

In seeking summary disposition of plaintiff's lawsuit, defendants argued essentially that there had been no "shopping center" on the Entire Parcel since 2019, and thus, considering the change in circumstances, it would be inequitable to enforce the terms of the Cross-Easement Agreement. Defendants relied on two inapposite cases to support their argument, as they do on appeal. First, *Diboye*, 351 Mich 550, concerned whether building and use restrictions applicable to lots in a subdivision recorded in 1939—that only private residences could be constructed—were applicable considering that the property at issue was located on a highway and had changed such that it was used primarily for commercial purposes. *Id*. at 552, 556-557. Second, *Windemere-Grand Improvement & Protective Ass'n*, 205 Mich 539, also concerned whether a building restriction allowing only residential homes was applicable considering that the property at issue was located on Woodward Avenue and had changed such that it was "admitted only can and should be devoted to business purposes." *Id*. at 540, 542. Clearly, the changing of a residential neighborhood is not at issue in this case.

Nevertheless, the trial court granted defendants' motion for summary disposition, concluding that the purpose of the Cross-Easement Agreement was to support an "integrated shopping center" and that purpose ceased to exist; thus, the reciprocal easements terminated. The Court relied on the holding in *MacLeod*, 254 Mich 653, to support its decision. That case involved a county easement for a drain granted in 1876 and, subsequently, "the proposed drainage was provided elsewhere." *Id*. at 654, 656. The *MacLeod* Court held: "For fifty-four years this easement has been dormant and renounced by the county in the establishment of the drainage elsewhere. Such an easement as this can be extinguished by abandonment of purpose or by renunciation showing that other means employed serve the purpose." *Id*. at 656. Similarly, here, the trial court apparently concluded that the purpose of the reciprocal easements in this case was abandoned, and thus, the easements were extinguished. We cannot agree.

First, plaintiff and defendants are successors in interest to the Cross-Easement Agreement by its plain terms and there is no evidence that plaintiff ever abandoned the purpose of the Agreement or that the easements had been dormant for years. To the contrary, plaintiff leases the property to a grocery store and gas station just like Ironwood Oil, its predecessor in title, did at that location. In fact, when plaintiff purchased the property, Shopko was still operating its department store. Consequently, plaintiff had a right to, and likely did, rely on the terms of that Cross-Easement Agreement—and its stated *reciprocal* easements, rights, and obligations—when it purchased its property to which the Agreement was applicable. Unlike in the case of *MacLeod*, 254 Mich 653, this case involves reciprocal easements. And easements are legal property interests, although they are limited in nature. *Michigan Dept of Natural Resources v Carmody-Lahti Real Estate, Inc*, 472 Mich 359, 378; 699 NW2d 272 (2005). Moreover, to establish abandonment of an easement interest, both an intent to relinquish that interest and an external act showing a clear intent to abandon that interest must be shown. *Id*. at 385 (citation omitted). Even nonuse is insufficient to show abandonment. *Id*. And in this case, there was no evidence to establish abandonment of the reciprocal easement interests.

Second, an easement "is the right to use the land of another for a specified purpose." *Schadewald v Brulé*, 225 Mich App 26, 35; 570 NW2d 788 (1997). While the original contracting parties hoped or desired to develop an "integrated and unified shopping center," the actual purpose of the reciprocal easements was to provide shared access between their adjoining properties "for pedestrian and vehicular ingress, egress, parking, passage and traffic and for utilities in, over, upon, across and through the Common Areas and such other areas as are hereinafter provided *as though* the Entire Parcel were developed and utilized as a single integrated shopping center." (Emphasis supplied). The purpose of an easement is determined by the language of the easement and, when unambiguous and plain, it must be enforced as written. *Blackhawk Dev Corp*, 473 Mich at 41-42; *Little*, 468 Mich at 700. The Cross-Easement Agreement plainly established reciprocal easement rights to use each other's land for the specified purpose of allowing shared access to common areas and other designated areas of their adjoining properties. It also established contractual obligations pertaining to the maintenance of those areas. Obviously, the Cross-Easement Agreement did not establish a partnership to construct and develop a shopping center. "Once granted, an easement cannot be modified by either party unilaterally." *Schadewald*, 225 Mich App at 36.

Third, the reciprocal easements were granted by the Cross-Easement Agreement, and thus, we turn to that Agreement to determine their duration. Article XI addresses "Duration and Termination." Section 11.01 states: "The easements, covenants, restrictions and other provisions of this Agreement shall be of perpetual duration." Section 11.02 is titled "Amendment," and states:

> This Agreement, or any easement, covenant, restriction or undertaking contained herein, may be terminated, extended or amended as to each of the portions of the Entire Parcel only by the recording of the appropriate document in the Office of the Register of Deeds of Houghton County, Michigan, which document must be executed by all of the owners and mortgagees, and other holders of recorded interests affected thereby, as of the date of such document, of the Entire Parcel.

Nevertheless, defendants argued in the trial court that the purpose of the easements ceased to exist because a "shopping center" does not exist. It is true that an easement limited to a specific purpose terminates when that "purpose ceases to exist, is abandoned, or is rendered impossible of accomplishment." *Carmody-Lahti Real Estate, Inc*, 472 Mich at 381-382 (citation omitted). But, as explained above, the purpose of the reciprocal easements at issue here was not to establish a shopping center; the purpose was, at minimum, to allow shared access to common areas and other designated areas with regard to these adjoining properties. There is no evidence that such purpose ceased to exist, was abandoned, or rendered impossible. The parking lots, roadways, and other paved and unpaved areas between the properties continue to exist. In fact, plaintiff filed this lawsuit to enforce its legal rights under the Cross-Easement Agreement.

And if the original contracting parties had intended the reciprocal easements and other rights and obligations to terminate when Shopko or Ironwood Oil sold their properties, or when any other particular event occurred, they could have so stated in the Cross-Easement Agreement. We note, also, that there are no requirements or limitations stated in the Cross-Easement Agreement with regard to the potential uses of the properties at issue with the exception that—as stated in Section 6.02—as long as the Shopko site was operating a general merchandise discount department store and as long as a gas station and grocery store were on the Developer's site, no such competing establishments were permitted. But there was no provision, for example, limiting

property use to retail stores or retail services, or excluding movie theaters, banks, restaurants, or other entities. Instead, Section 14.01 of the Cross-Easement Agreement states, without qualification: "The Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, administrators, representatives, successors and assigns." Moreover, defendants could have sought the termination or amendment of the "Agreement, or any easement, covenant, restriction or undertaking contained" therein by the procedure set forth in Section 11.02. But no such action was taken. Consequently, the Cross-Easement Agreement, which was recorded in the chain of title and runs with the land, is binding and enforceable against plaintiff and defendants as the successors in interest of the original contracting parties.

Accordingly, the trial court erroneously concluded that the reciprocal easements established by the Cross-Easement Agreement were no longer valid or enforceable. Therefore, the trial court's opinion and order granting defendants' motion for summary disposition of plaintiff's second amended complaint is vacated. We also vacate the trial court's opinion and order denying plaintiff's motion for partial summary disposition or for summary disposition of plaintiff's declaratory judgment and breach of contract claims—to the extent the trial court concluded that the Cross-Easement Agreement was not valid and enforceable, only. Plaintiff is entitled to summary disposition of its declaratory judgment action, to the extent it sought a judicial declaration that the Cross-Easement Agreement was valid and enforceable. And we affirm the trial court's opinion and order granting plaintiff's motion for summary disposition of defendants' counter-complaint. This matter is remanded for proceedings consistent with this opinion, including for resolution of plaintiff's breach of contract and trespass claims.

Vacated in part, affirmed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Michael J. Riordan
/s/ Sima G. Patel

-11-